**DELANO FARMS COMPANY, Four Star Fruit, Inc., and Gerawan Farming, Inc., Plaintiffs,**

v.

**The CALIFORNIA TABLE GRAPE COMMISSION, Defendant.**

**No. 1:07–cv–1610 OWW SMS.**

United States District Court, E.D. California.

Feb. 20, 2009.

Brian C. Leighton, Law Offices of Brian C. Leighton, Clovis, CA, Lawrence Milton Hadley, Omer Salik, Hennigan Bennett & Dorman, Los Angeles, CA, Ralph B. Wegis, The Law Offices of Ralph B. Wegis, P.C., Bakersfield, CA, for Plaintiffs.

Brian Matthew Boynton, Randolph D. Moss, PHV, Leon B. Greenfield, PHV, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, for Defendant.

MEMORANDUM DECISION AND OR- DER [GRANTING IN PART AND DENYING IN PART] DEFEN- DANT'S MOTION TO DISMISS AND [DENYING] DEFENDANT'S MOTION TO STRIKE (Doc. 19)

OLIVER W. WANGER, District Judge.

## I. INTRODUCTION

Defendant, The California Table Grape Commission ("Commission"), moves to dis-

miss Plaintiffs' Delano Farms Company ("Delano"), Four Star Fruit, Inc. ("Four Star"), and Gerawan Farming, Inc. ("Gerawan"), entire complaint pursuant to Federal Rule of Civil Procedure 19(a), claiming the United States is a necessary party, and moves to dismiss pursuant to Federal Rule of Civil Procedure 19(b), claiming the government is an indispensable party and immune from this suit. Defendant additionally moves to dismiss Plaintiffs' remaining claims for (1) Inequitable Conduct, (2) Sherman and Clayton Anti–Trust violations, (3) Patent Misuse, (4) Unfair Competition, (5) Unjust Enrichment and (6) Constructive Trust. Defendant moves to strike certain portions of Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(f). (Doc. 20, Motion to Dismiss, Filed December 14, 2007). Plaintiffs oppose the motion. (Doc. 24, Opposition, filed January 9, 2008.) Defendant filed a notice of supplemental authority on June 17, 2008, (Doc. 39). This matter was heard on May 19, 2008.

## II. *PROCEDURAL BACKGROUND*

Plaintiffs filed their complaint on November 5, 2007. (Doc. 1, Complaint). The Commission filed its Motion to Dismiss on December 14, 2007, (Doc. 20), which Plaintiffs opposed on January 9, 2008. (Doc. 24, Opposition). On January 21, 2008, Defendant filed a reply to Plaintiffs' Opposition. (Doc. 26, Reply).

## III. *FACTUAL BACKGROUND*

A. *Parties*

Plaintiff Delano is a corporation duly organized and existing under the laws of the State of Washington, with its principal place of business at Hoquiam, Washington. Plaintiff Four Star is a corporation duly organized and existing under the laws of the State of California, with its principal place of business at Delano, California. Plaintiff Gerawan is a corporation duly

organized and existing under the laws of the State of California, with its principal place of business at Sanger, California. Plaintiffs are engaged in the business, *inter alia*, of growing, harvesting and selling table grapes.

Defendant is a corporation of the State of California, established by the 1967 Ketchum Act. Cal. Food & Agric. Code §§ 65550–65551. Defendant's principal place of business is at Fresno, California. The stated purpose of the Commission is to expand and maintain the market for California table grapes for the benefit of the State of California as well as the State's over five hundred California table grape growers. The Commission is funded primarily by assessments levied on each shipment of California table grapes and paid by the State's table grape shippers. No general revenues of the State fund the Commission. (Doc. 1, Complaint, ¶¶ 4–9).

B. *USDA Research Program*

California table grape growers and shippers have funded a research program under the U.S. Department of Agriculture ("USDA") to develop new table grape varieties. Growers and shippers fund the USDA research program through the Commission by an assessment on each box of table grapes shipped in California. Prior to 2002, the USDA provided the new varieties under development to area growers for evaluation of growing potential and commercial marketability. Once new varieties appeared commercially viable, the USDA "released" the variety, and distributed plant material of the variety to area growers free-of-charge. The USDA did not charge California growers for the new varieties since California growers and shippers already paid for a large portion of the development. (Complaint, ¶ 10). Accordingly, when a variety under development appeared commercially successful, it

was not uncommon for many growers to have reproduced and commercially sold the variety prior to an official "release" by the USDA. (Complaint, ¶ 43).

## C. *Commission Patents Grape Varieties*

In the late 1990s, the Commission developed a scheme by which it and a few select nurseries could profit from the new varieties that the USDA distributed for free. At the urging of the Commission, the USDA agreed to begin patenting new table grape varieties. California shippers already funded much of the development, but the USDA agreed to give the Commission an exclusive license to all new patented varieties, and to allow the Commission to charge royalties when growers wished to obtain the new varieties. The USDA also agreed to give the Commission exclusive enforcement powers over its new patent rights. (Complaint, ¶ 21).

Under the Commission's "patent and licensing" scheme, the Commission hand-selected three nurseries to exclusively sell all new patented table grape varieties ("Licensed Nurseries"). Unlike the prior free distribution, the nurseries would be allowed to sell new varieties to growers. (Complaint, ¶ 13). The Licensed Nurseries are responsible for paying the royalty, but the Licensed Nurseries are allowed to pass the royalty amount on to the purchasing growers, which they do and have done. The Commission pays a portion of the royalty to the USDA. (Complaint, ¶ 28).

When a grower seeks to obtain a new variety from a nursery, it is required to enter a "Domestic Grower License Agreement" or "License Agreement" with the Commission. Under the terms of the License Agreement, the grower cannot propagate the variety beyond the plant purchased. If the Commission believes the grower has violated the License Agreement, it can void the License Agreement and order that all purchased plants be destroyed. (Complaint, ¶ 13).

The first three varieties that the Commission identified to the USDA for patenting had been under development for years. At least one of the varieties had been distributed to growers for wide-scale commercial evaluation and sale. (Complaint, ¶ 14). Recognizing that at least one of the new varieties identified for patenting (and perhaps all three) had been previously in public use and/or sold commercially, the Commission created a so-called "amnesty program" designed to hide the fact that valid patents could not be obtained, and to extort funds from growers already in possession of the varieties. Under the amnesty program, the Commission widely disseminated notices to growers and shippers stating that they were in violation of the law if they possessed the varieties intended for patenting. The notices also offered confidential "settlements" to any growers who, within a narrow window, agreed to license the varieties, pay a "penalty" to the Commission, and accept the Commission's license restrictions on further propagation. (Complaint, ¶ 15).

In May 2004, the commission sent a notice to all California table grape growers and shippers stating that the USDA had applied for a patent on the Sweet Scarlet variety. Although no enforceable patent had yet issued, the Commission offered "amnesty" for any grower who had previously reproduced Sweet Scarlet. Under its so-called "amnesty" program, a grower with Sweet Scarlet could keep the vines reproduced, so long as the grower (i) admitted to possession prior to July 2004, (ii) paid $2 per vine reproduced, (iii) paid $2 per box of Sweet Scarlet grapes previously shipped, and (iv) agreed to no further propagation of the Sweet Scarlet variety from the plants possessed. (Complaint, ¶ 60).

In July 2004, the Commission sent another notice to all California table grape growers and shippers extending the "amnesty" time period for one month, and extending the "amnesty" to include Autumn King and Scarlet Royal varieties. (Complaint ¶ 61). In both notices, the Commission threatened to sue growers who did not come forward, and to seek money damages and injunctions. Yet, at the time of the second notice, the USDA patent application on Sweet Scarlet not only remained un-issued, but had been rejected by the USPTO. Moreover, the USDA had not even applied for a patent on either Autumn King or Scarlet Royal. The USDA had no patent rights, and the Commission lacked any enforcement rights. (Complaint, ¶ 62). On information and belief, at the time the Commission sent the "amnesty" notices in May and June, 2004, the USDA, and Dr. Ramming knew of the public use and sale with respect to the Sweet Scarlet that occurred prior to February 20, 2002—more than one year prior to the filing of the '512 Application on the Sweet Scarlet variety. (Complaint, ¶ 63). On information and belief, the Commission, the USDA, and Dr. Ramming learned (prior to the July 25, 2005, issue date for Sweet Scarlet) that at least some of the 17 growers who agreed to the Commission's "amnesty" program for that variety had possessed and reproduced Sweet Scarlet prior to February 2002. On information and belief, the Commission, the USDA, and Dr. Ramming knew that such information was material to the patentability of the Sweet Scarlet variety. (Complaint, ¶ 64). Seventeen growers confirmed possession of the varieties and agreed to pay the penalties demanded by the Commission, confirming its expectation that varieties identified for patenting were in public use. (Complaint, ¶ 17).

### D. *Patents in Prior Use*

■ The USDA and inventor of the new varieties breached their duty of candor to the United States Patent & Trademark Office ("USPTO") by not reporting these prior public uses and sales when applying for patents on the new varieties. Under Patent Law, public use or sale of an invention more than one year prior to filing a patent application bars patentability. Based on these facts, none of the patents on the new varieties are valid. The USDA and inventor committed inequitable conduct before the USPTO. The Commission demanded licenses and accepted royalties on knowingly invalid patents.

Plaintiffs seek to hold the patents invalid so the varieties can be freely distributed, to obtain the return of royalty payments illegally collected from growers and shippers, and to stop the Commission from engaging in further illegal activities through the use of patents. (Complaint, ¶ 17).

### E. *Patents*

#### 1. *Sweet Scarlet*

On February 20, 2003, the USDA filed patent application No. 371,512 (the "'512 Application") on a grapevine denominated "Sweet Scarlet." On July 26, 2005, the '512 Application issued as U.S. Patent No. PP15,891, entitled "Grapevine Denominated Sweet Scarlet" (the "'891 patent"). (Complaint, ¶ 18). The United States of America, as represented by the Secretary of Agriculture, is the owner by assignment of the '891 patent. (Complaint, ¶ 19). On information and belief, the Commission is the exclusive licensee of the '891 patent pursuant to a license agreement entered into between the United States Government, as represented by the United States Department of Agriculture, Agricultural Research Services, and the Commission. The exclusive license includes the right to

license the '891 patent and to enforce the '891 patent against alleged infringers. (Complaint, ¶ 20).

### 2. *Autumn King*

On September 28, 2004, the USDA filed patent application No. 953,387 (the "'387 Application") on a grapevine denominated "Autumn King." On February 21, 2006, the '387 Application issued as U.S. Patent No. PP16,284, entitled "Grapevine Denominated Autumn King" (the "Autumn King or '284 patent"). The United States of America, as represented by the Secretary of Agriculture, is the owner by assignment of the '284 patent. (Complaint, ¶¶ 21, 22). On information and belief, the Commission is the exclusive licensee of the '284 patent pursuant to a license agreement entered into between the United States Government, as represented by the United States Department of Agriculture, Agricultural Research Services, and the Commission. The exclusive license includes the right to license the '284 patent and to enforce the '284 patent against alleged infringers. (Complaint, ¶ 23).

### 3. *Scarlet Royal*

On September 28, 2004, the USDA filed patent application No. 953,124 (the "'124 Application") on a grapevine denominated "Scarlet Royal." On January 31, 2006, the '124 Application issued as U.S. Patent No. PP16,229, entitled "Grapevine Denominated Scarlet Royal" (the "Scarlet Royal or '229 patent"). The United States of America, as represented by the Secretary of Agriculture, is the owner by assignment of the '229 patent. (Complaint, ¶¶ 24, 25). On information and belief, the Commission is the exclusive licensee of the '229 patent pursuant to a License Agreement entered into between the United States Government, as represented by the United States Department of Agriculture, Agricultural Research Services, and the Commission. The exclusive license includes the right to license the '229 patent and to enforce the '229 patent against alleged infringers. (Complaint, ¶ 26).

### F. *Plaintiffs' License Agreements*

Plaintiffs are in possession of the Autumn King, Sweet Scarlet and Scarlet Royal varieties, which they purchased through Licensed Nurseries. Plaintiffs paid the royalties imposed by the Commission on each purchased plant. (Complaint, ¶ 30). Plaintiffs have entered into a License Agreement with the Commission for each of the Patented Varieties. In consideration for this limited, nonexclusive license, Plaintiffs have paid a license fee to a Licensed Nursery. Under the terms of this agreement, Plaintiffs have a limited, nonexclusive license of the Patented Varieties, to grow the variety and sell the fruit produced. Plaintiffs cannot propagate the grapevines or distribute the vines to third parties. Further, Plaintiffs are obligated to destroy all Patented Varieties' plant material upon termination of the agreement. (Complaint, ¶¶ 31–33).

### G. *Commission's Patent and Licensing Program*

The Commission requires that California grape shippers pay an assessment of approximately $0.13 per box of table grapes. The Commission operates at an annual surplus from these assessments, but does not return any of the assessment money back to the California growers or shippers. (Complaint, ¶ 34). Dr. Ramming, the co-inventor of the patented Autumn King, Sweet Scarlet and Scarlet Royal varieties, is a researcher at the Agriculture Research Center ("ARC") of the USDA located in Fresno, California. For at least 20 years, Dr. Ramming has operated a research program at the ARC relating to the development of new table grape varieties. Since the early 1980s, the Commission has

funded a portion of Dr. Ramming's grapevine breeding program with funds collected through the shipper assessments. In many years, the Commission's funding has amounted to over one-third of the total table grape research budget at the ARC, excluding employee salaries. (Complaint, ¶ 35). Prior to 2003, the USDA had never sought patent protection for any new table grape variety developed at the ARC.

The USDA agreed that the Commission could serve as the exclusive licensee for patented varieties in the collection of royalties and enforcement against infringers. (Complaint, ¶ 37). In exchange for seeking patent protection, and providing an exclusive license to the Commission, the Commission and the USDA agreed that revenues from the patent licensing program would be shared between the USDA and the Commission. However, the USDA indicated that it was not interested in profiting from the patenting program. Additionally, Dr. Ramming received no extra compensation from the patenting of varieties he developed. (Complaint, ¶ 39).

In accordance with the agreement between the Commission and the USDA, the Commission charges nurseries that distribute patented varieties a $5,000 participation fee per patented variety and an additional $1 per production unit royalty. These costs are then passed on by the nurseries to the California grape growers, who purchase the patented plant material from the nurseries, including Plaintiffs who purchased the Patented Varieties. (Complaint, ¶ 40). The California grape growers who bear the ultimate costs of the royalty fees imposed by the Commission are the same California grape growers who bear the cost of the per box assessment charged by the Commission, which funds much of Dr. Ramming's breeding program. Thus, California table grape growers essentially pay for the development of patented varieties, then pay again to obtain the varieties. (Complaint, ¶ 41).

The Commission's Research Committee and Board oversee and administer the patent and licensing program. Specifically, the Board sets the royalty rates on patented plants, determines penalties for infringement, and establishes enforcement policy. The Research Committee oversees Dr. Ramming's breeding program and makes recommendations regarding which new varieties should be patented and released. To date, the USDA has only patented new varieties that the Commission has recommended for patenting, and has only applied for patents once receiving a recommendation from the Commission to do so. (Complaint, ¶ 42).

1. *Prior Uses and Sales of Patented Varieties*

Development of the Patented Varieties began in about 1993. Prior to 2003, Dr. Ramming had reproduced each of the Patented Varieties, Sweet Scarlet, Autumn King, and Scarlet Royal, produced fruit from each of the Patented Varieties, and had evaluated the potential commercialization of each Patented Variety. (Complaint, ¶ 46).

Dr. Ramming did not keep the development of the Patented Varieties secret. To the contrary, Dr. Ramming discussed each of the Patented Varieties with the Commission over many years, including between 2001 and 2003. Dr. Ramming discussed the Patented Varieties during public meetings of the Commission's Research Committee. Additionally, prior to 2003, Dr. Ramming displayed fruit from the Patented Varieties at Commission meetings, which area growers and shippers attended. Attendees were allowed to take samples of fruit from the three varieties. (Complaint, ¶ 47).

By 2001, the Commission's Research Committee was actively evaluating the Sweet Scarlet, Autumn King, and Scarlet Royal varieties (among others) for USDA release. The Commission recommended that Sweet Scarlet should be released in 2002. The Commission also recommended that the USDA seek patent protection on Sweet Scarlet as the first variety for patenting under the Commission's new patent and licensing program. After receiving the Commission's recommendation, the USDA proceeded with the release of Sweet Scarlet and filed a patent application on the Sweet Scarlet variety in February 2003. (Complaint, ¶ 48). Although the Commission recommended proceeding with the release of Sweet Scarlet, the Commission decided to delay any release and patenting of Autumn King and Scarlet Royal. Instead, the Commission recommended that Autumn King and Sweet Scarlet undergo further evaluation prior to release. Eventually, the Commission recommended release of Autumn King and Scarlet Royal approximately two years later, in 2004. At that time, the Commission further recommended that the USDA seek patent protection for Autumn King and Scarlet Royal. (Complaint, ¶ 49).

Despite waiting for the Commission's recommendations on releasing new varieties to seek patent protection, Dr. Ramming could have filed patent applications much earlier. All three Patented Varieties had been reproduced and undergone several growing cycles well before the Commission recommended release in 2002 for Sweet Scarlet, and 2004 for Autumn King and Scarlet Royal. By 2001–2002 (if not before), all three varieties had been developed to a point at which they were ready

for patenting. The Commission's recommendations regarding continued evaluation of the Autumn King and Sweet Scarlet varieties prior to release did not prevent the USDA from seeking patent protection on these varieties long before receiving a recommendation regarding releases. (Complaint, ¶ 50).

Although the USDA delayed the decision to apply for patents on Autumn King and Scarlet Royal, it made little effort to prevent these varieties from entering the public domain. The USDA did not conceal the varieties. To the contrary, prior to seeking patent protection, the USDA displayed and discussed the varieties at public meetings. Moreover, the USDA kept its fully developed Autumn King and Scarlet Royal plants at unsecured facilities at California State University at Fresno ("Fresno State"), which could be accessed through the Fresno State grounds. The USDA never made efforts to secure plant materials sent to other facilities for testing. (Complaint, ¶ 51).[1]

While delaying the decision to seek patent protection, and failing to implement security measures at its facilities, the USDA knew that public use had been made of new varieties more than one year before applying for a patent would bar later filing for patent protection. Indeed, the Commission and Dr. Ramming discussed the fact that public uses and sales of new varieties prior to seeking patent protection could jeopardize the Commission's patenting program. (Complaint, ¶ 52). All three Patented Varieties entered the public domain more than one year before the USDA sought patent pro-

---

1. The USDA considered placing a fence around its facilities adjacent to the Fresno State campus, but declined to do so. Although the USDA purportedly told employees that they were not to take or distribute plant materials from new varieties, the USDA made no efforts to examine materials removed from the USDA facility to ensure that persons entering the facility did not remove plant material for these varieties. (Complaint, ¶ 51).

tection on each respective variety. (Complaint, ¶ 53).

The Sweet Scarlet variety and its fruit was publicly used, distributed, offered for sale and sold by growers and shippers prior to February 20, 2002—more than one year prior to the filing of the '512 Application on the Sweet Scarlet variety. Specifically, approximately nine growers received Sweet Scarlet from Dr. Ramming for trials in 1999 and 2000. At least three of these growers sold fruit produced into commercial markets before 2002. (Complaint, ¶ 54). Additionally, at least 17 other growers, who were not part of trials, received and reproduced the Sweet Scarlet variety. On information and belief, these reproductions took place prior to 2002. Neither the USDA, nor Dr. Ramming oversaw or controlled the reproductions created by these 17 growers. (Complaint, ¶ 55).

In early 2002, more than two years before filing the patent applications for Autumn King and Scarlet Royal, a grower in Delano, California (J & J Farms, owned by Jim and Jack Ludy) obtained "sticks" of several new varieties, including Autumn King and Scarlet Royal. Jim and Jack Ludy provided some of the plant material for the new varieties (including Autumn King and Scarlet Royal) to their cousin (Lawrence Ludy) who owned and operated an adjacent farm ("Ludy Farms"). With these sticks, the Ludys reproduced Autumn King and Scarlet Royal grapevines on their farms in 2002. Lawrence Ludy reproduced additional Autumn King on his farm in mid–2003. In total, J & J Farms and Ludy Farms reproduced more than five hundred Autumn King and Scarlet Royal plants before September 2003. (Complaint, ¶ 57). J & J Farms and Ludy Farms received the Autumn King and Scarlet Royal plant material without any written or verbal agreement or restrictions on disclosure or use. Neither the USDA, nor Dr. Ramming oversaw or controlled

the reproductions that occurred on the Ludy Farms. Although Ludy Farms was privately owned, it placed no special restrictions such as fences or gates limiting public access to its fields and the location of the Autumn King and Scarlet Royal plants. Nor did Ludy Farms place any confidentiality restrictions on employees who viewed the reproduced new varieties. Finally, prior to September 2003, both J & J Farms and Ludy Farms showed the reproduced varieties to members of the public, including neighboring farmers, without any confidentiality restrictions. (Complaint, ¶ 57). The USDA and Dr. Ramming did not disclose to the USPTO the information regarding all the growers who possessed and reproduced Sweet Scarlet prior to February 20, 2002, which the Commission learned through its "amnesty" program. (Complaint, ¶ 65).

On information and belief, both the USDA and the Commission knew, before the respective patents issued on the Patented Varieties, that (i) Sweet Scarlet had been in the public domain since before February 2002, and (ii) either knew or suspected that Autumn King and/or Scarlet Royal had been in the public domain since before September 2003. (Complaint, ¶ 58). Because the known public use and sale of the Patented Varieties, more than one year before the patent application filing would prevent issuance of valid patents, the Commission (with the USDA's knowledge and approval), created a scheme to prevent challenges to patentability based on these prior uses and sales. (Complaint, ¶ 59).

## IV. *REQUEST FOR JUDICIAL NOTICE*

Defendant Commission requests judicial notice pursuant to Federal Rule of Evidence Rule 201, of Defendant Party–United States of America's memorandum of

points and authorities filed in the District Court case of *Nutrition 21 v. Thorne Research, Inc.,* 130 F.R.D. 671 (D.Wash.1990) and Appellee Party–United States of America's brief filed in Federal District appeal case of *Nutrition 21 v. United States,* 930 F.2d 862 (Fed.Cir.1991). (Doc. 27, Commission Request for Judicial Notice, filed January 21, 2007, Exhibit 1 and Exhibit 2). Plaintiffs provide no objection to this request. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b); *see Biggs v. Terhune,* 334 F.3d 910, 916, n. 3 (9th Cir.2003) ("Materials from a proceeding in another tribunal are appropriate for judicial notice.")

Defendant's request for judicial notice is GRANTED as to the documents and their existence, but not as to any disputed contents of those papers.

## V. *LEGAL STANDARD*

Fed.R.Civ.P. 12(b)(6) provides that a motion to dismiss may be made if the plaintiff fails "to state a claim upon which relief can be granted." However, motions to dismiss under Fed.R.Civ.P. 12(b)(6) are disfavored and rarely granted. *Gilligan v. Jamco Development Corp.,* 108 F.3d 246, 249 (9th Cir.1997). In deciding whether to grant a motion to dismiss, the Court "accept[s] all factual allegations of the complaint as true and draw[s] all reasonable inferences" in the light most favorable to the nonmoving party. *TwoRivers v. Lewis,* 174 F.3d 987, 991 (9th Cir.1999); *see also, Rodriguez v. Panayiotou,* 314 F.3d 979, 983 (9th Cir.2002). A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable infer-

ences." *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001).

The question before the court is not whether the plaintiff will ultimately prevail; rather, it is whether the plaintiff could prove any set of facts in support of his claim that would entitle him to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). "A complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Van Buskirk v. CNN, Inc.,* 284 F.3d 977, 980 (9th Cir.2002) (citations omitted).

## VI. *ANALYSIS*

### A. *Joinder of Parties*

Defendant argues that the United States is not a named defendant and is a necessary and indispensable party to certain claims under Federal Rule of Civil Procedure 19. Further, because the United States is not subject to suit under the doctrine of sovereign immunity, Plaintiffs cannot join the United States to this action, and this action must be dismissed under Rule 19(b).

Plaintiffs' first three causes of action seek a declaration of the invalidity of the three U.S.-owned patents under 35 U.S.C. § 102(b) ('891 Patent, '284 Patent and '229 Patent). Defendant seeks to dismiss these causes of action. Defendant's argument that the United States is a necessary and indispensable party is based on the fact that the patents sought to be invalidated are owned by the U.S., a sovereign entity, and Plaintiffs have failed to identify a waiver of sovereign immunity. Plaintiffs allege in the Complaint that the USDA and Dr. Ramming, of the USDA, knowingly did not disclose to the USPTO that the Patented Varieties had been in the public

domain more than one year before the patent application filing dates in violation of the Patent Act. And they allegedly knew that this information would prevent issuance of valid patents. (Doc. 1, Complaint, ¶¶ 53, 58–9). Plaintiffs' Complaint is brought against the Commission only. Section 120 of the Patent Act states:

A person shall be entitled to a patent *unless- (b) the invention was* patented or described in a printed publication in this or a foreign country or *in public use* or on sale in this country, *more than one year prior to the date of the application* for patent in the United States …

35 U.S.C. § 120(b) (emphasis added).

Defendant also seeks to dismiss Plaintiffs' fourth and sixth claims on the same basis as the first three claims, the U.S. is a necessary and indispensable party and is a sovereign entity immune from this suit. Plaintiffs' fourth claim seeks a declaration that the U.S.-owned patents are unenforceable, in part, due to alleged "inequitable conduct" by the USDA. This directly implicates the interests of the United States, the patent owner, as it would render the patents useless if they are found unenforceable. Claim six is a patent misuse claim, in which Plaintiffs seek a declaration that the patent is also unenforceable due to the Commission's misuse of the patents. Defendant argues this makes the United States a necessary and indispensable party to claims one through four and six.

■ "[W]here sovereign immunity is asserted, and the sovereign's claims are not frivolous, dismissal must be ordered where there is a potential for injury to the absent sovereign's interests." *Republic of Philippines v. Pimentel,* —— U.S. ——, 128 S.Ct. 2180, 2182–83, 171 L.Ed.2d 131 (2008). Rule 19 governs the circumstances under which persons must be joined as parties to a lawsuit. Rule 19 provides in relevant part:

(a) Persons Required to Be Joined if Feasible.

(1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest ….

(b) When Joinder Is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) The extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder.

Fed.R.Civ.P. 19.

The "[a]pplication of Rule 19 involves three successive inquiries." *Wilbur v. Locke*, 423 F.3d 1101, 1111 (9th Cir.2005). "First, the court must determine whether a nonparty should be joined under Rule 19(a)." The term "necessary" is used to describe those persons to be joined if feasible. *Id.* at 1112. "The inquiry is a practical one and fact specific, and is designed to avoid the harsh results of rigid application." *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir.1992).

■ Second, "[i]f an absentee is a necessary party under Rule 19(a)," the court is to determine "whether it is feasible to order that the absentee be joined." *Wilbur*, 423 F.3d at 1112. "Finally, [and thirdly,] if joinder is not feasible, the court must determine at the third stage whether the case can proceed without the absentee, or whether the absentee is an 'indispensable party' such that the action must be dismissed." *Id.; Shermoen*, 982 F.2d at 1317 (a court must determine whether the absent party is "indispensable" so that in "equity and good conscience" the suit should be dismissed). In the final analysis, "[r]ule 19 uses the word 'indispensable' only in a conclusory sense, that is, a person is 'regarded as indispensable' when he cannot be made a party and, upon consideration of the factors [in Rule 19(b) ], it is determined that in his absence it would be preferable to dismiss the action, rather than to retain it." *Wilbur*, 423 F.3d at 1112.[2]

**1. *United States is a Necessary Party Under Rule 19(a).***

■ The United States has an "interest relating to the subject of the action"— which is the validity and enforceability of the three patents it owns and the royalties under those patents that it receives. Fed. R.Civ.P. 19(a)(1)(B)(i). Disposition of the claims without the participation of the United States will "as a practical matter impair or impede" the United States' "ability to protect [its] interests." *Id.*

**a. *Joinder Voluntarily or Involuntarily of Patent Owner.***

The U.S. has retained substantive rights in a patent that is the subject of the exclusive license and therefore is an indispensable party. *Waterman v. Mackenzie*, 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923 (1890). The Ninth Circuit case *Massa v. Jiffy Products Co.*, 240 F.2d 702 (9th Cir. 1957), holds that the patent owner is an indispensable party in a case challenging the validity of the patent. "When ownership of the patent and the trademark in *Massa* appeared from his deposition, an involuntary joinder of *Massa* as a party defendant under Rule 19, Fed.R.Civ.P. became proper. Massa, appearing as the registered owner of the patent and trade mark, became an indispensable party in the declaratory judgment action, *in order that the alleged infringer might have tried in the one action, as to all parties, the invalidity of the patent and the alleged improper recordation of the trade mark."* *Id.* at 705 (emphasis added). The one exception to this rule, is when a licensee is transferred all "substantial rights" in the patent from the patent owner. This ex-

---

**2.** The terms "necessary" and "indispensable" are terms of art in Rule 19 jurisprudence: "Necessary" refers to a party who should be "[j]oined if [f]easible." *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 867 n. 5 (9th Cir.2004). " 'Indispensable' refers to a party whose participation is so important to the resolution of the case that, if the joinder of the party is not feasible, the suit must be dismissed." *Id.*

ception is not here applicable to the License Agreements between the Commission and the United States.

In the Federal Circuit case describing the "rule of reciprocity," *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090 (Fed.Cir.1998), the court held that where the non-exclusive licensee did not hold an exclusive license with all "substantial rights," *i.e.*, the right to bring an enforcement action without joining the patent owner, there can no declaratory judgment brought against the licensee, without joining the patent owner. "We have accorded standing, in certain limited circumstances, where all substantial rights under the patent have been transferred in the form of an exclusive license, rendering the licensee the virtual assignee." *Id.* at 1093–94, *citing Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870 (Fed.Cir.1991).

■ The general rule in patent infringement suits, which applies in declaratory relief actions seeking invalidity of a patent, is that the patent owner is to be joined when fewer than all substantial rights have been transferred in an exclusive license to the licensee. *Intellectual Property Development, Inc. v. TCI Cablevision of Cal.*, 248 F.3d 1333 (Fed.Cir.2001). "As a general rule, in accordance with *Independent Wireless*, this court adheres to the principle that a patent owner should be joined, either voluntarily or involuntarily, in any patent infringement suit brought by an exclusive licensee having fewer than all substantial patent rights." *Id.* at 1347;[3]

*see also Independent Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 468, 46 S.Ct. 166, 70 L.Ed. 357 (1926) (patent owner is an indispensable party in infringement suit brought by a licensee); *see also Tol–O–Matic, Inc. v. Proma Produkt–Und Marketing Gesellschaft, m.b.H.*, 690 F.Supp. 798 (D.Minn.1987).

There are two reasons in infringement actions for requiring joinder of the patent owner when fewer than all "substantial rights" have been transferred, in a suit for declaratory relief to invalidate a patent. First, there is the possibility that the alleged infringer would be subject to multiple actions. *Schwarz Pharma, Inc. v. Paddock Laboratories, Inc.*, 504 F.3d 1371, 1374 (Fed.Cir.2007). Second, to ensure that the rights of the patent owner are protected in a suit brought by the licensee. *Id.* Although Plaintiffs' action is not an infringement action, the second reason applies where patent invalidation is sought. The United States and the USDA both have an interest in whether the Patents in suit are invalidated. If the patent is declared invalid, the United States loses the ownership and value of its patents and any royalty derived from the patents.[4] Second, the patent owner is at risk that a licensee did not diligently defend the patent in pending litigation. The patent owner may have a different perspective because the licensee's interests are limited.

Here, the USDA did not transfer all "substantial rights" as required under case law, specifically the right of assignment

3. "As a prudential principle, an exclusive licensee having fewer than all substantial patent rights possesses standing under the Patent Act as long as it sues in the name of, and jointly with, the patent owner and meets the Lujan requirements." *Id.; citing Prima Tek II L.L.C. v. A–Roo Co.*, 222 F.3d 1372 (Fed. Cir.2000).

4. Patents have long been considered a species of property. *See Brown v. Duchesne*, 60 U.S. 183, 197, 19 How. 183, 15 L.Ed. 595 (1856) ("For, by the laws of the United States, the rights of a party under a patent are his private property"); *cf., Consolidated Fruit–Jar Co. v. Wright*, 94 U.S. 92, 96, 24 L.Ed. 68 (1876); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 642, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999).

and the ability to bring enforcement actions. The Commission ostensibly is unauthorized to defend the declaratory suit seeking to invalidate the U.S.—owned patents, without the joinder of the United States. "[A] patent should not be placed at risk of invalidation by the licensee without the participation of the patentee," *Schwarz Pharma, Inc.*, 504 F.3d at 1374, especially here where fewer than all "substantial rights" have been transferred from patent owner to licensee. In *Intellectual Property Development Inc. v. TCI Cablevision of California*, 248 F.3d 1333, 1347 (Fed.Cir.2001), the court gave dispositive weight to the licensee's ability to only bring enforcement actions in limited circumstances, and only with consent of the patent owner. The Court also noted the licensee had no assignment rights. As a result, no "substantial rights" existed with the exclusive licensee. "In light of CPL's [patent holder] right to permit infringement in certain cases, the requirement that CPL [patent holder] consent to certain actions and be consulted in others, and the limits in IPD's right to assign its interests in the '202 patent, we find that the CPL IPD agreement at issue transfers fewer than all substantial rights in the '202 patent from CPL [patent holder] to IPD." *Id.* at 1345; *see also Vaupel Textilmaschinen KG v. Meccanica Euro Italia*, 944 F.2d 870, 875 (Fed.Cir.1991) (The court noted the importance of having the right to sue for infringement in determining whether joinder of patent owner is required.)

In *Abbott Laboratories v. Diamedix Corp.*, 47 F.3d 1128 (Fed.Cir.1995), the exclusive licensee did not have "substantial rights" because it lacked full enforcement rights, and possessed no assignment rights: 1) the exclusive licensee, while possessing the right of first refusal to sue alleged infringers of the patent, could not "indulge" or permit an infringement, which the court noted normally accompanies a

complete conveyance of the right to sue; 2) the exclusive licensee was prevented from assigning its rights under the license to any other party other than a successor in business; and 3) the patent owner retained the right to participate in a suit brought by the exclusive licensee.

Here, the License Agreements specify that the Commission, as licensee, cannot file an infringement suit without first obtaining authorization from USDA, the patent holder:

> In the event of [ ] infringement, the parties hereto shall confer and shall use best efforts to reach mutual agreement upon the best course of action.

*See* Ex. 1 (Sweet Scarlet License Agreement) § 8.1; Ex. 2 (Autumn King License Agreement) § 8.1; & Ex. 3 (Scarlet Royal License Agreement) § 8.1.5.

The License Agreements further provide:

> USDA *may* grant the right of enforcement to THE COMMISSION, pursuant to Title 35, Section 207(a)(2) and Title 35, Chapter 29, of the U.S.Code.

*Id.* at § 8.2 (emphasis added).

> The granting of the right of enforcement to THE COMMISSION shall be given thorough consideration on a *case by case basis.*

*Id.* (emphasis added).

The agreements reserve the right in the United States, to forego enforcement against infringers: The United States may "elect[ ] not to enforce the Licensed Patents or other intellectual property rights for the Licensed Variety against infringers." *Id.* There is no indication here that the Commission sought or received authorization from the USDA to defend this declaratory judgment suit against the USDA's patents. Last, the license agreements do not provide for assignment rights in the Commission:

This Agreement shall not be transferred or assigned by THE COMMISSION to any party other than to a successor or assignee of the entire business interest of THE COMMISSION relating to the Licensed Variety, but in no event shall THE COMMISSION assign or transfer this Agreement to a party not a citizen, resident, or entity of the United States of America. THE COMMISSION shall notify USDA in writing prior to any transfer or assignment.

(EL § 12.1).

While Section 35 U.S.C. § 207(a)(2) provides federal agencies, such as the USDA, the ability to grant exclusive licenses, the USDA did not do so here:

(a) Each Federal agency is authorized to—

(2) grant nonexclusive, exclusive, or partially exclusive licenses under federally owned inventions, royalty-free or for royalties or other consideration, and on such terms and conditions, *including the grant to the licensee of the right of enforcement* pursuant to the provisions of chapter 29 of this title as determined appropriate in the public interest.

35 U.S.C. § 207(a)(2) (emphasis added). And in conjunction with 35 U.S.C. § 207(a)(2), Federal Regulations provide, pursuant to 37 C.F.R. § 404.5, licenses may contain provisions permitting the right to enforce the patent by the licensee, without joining the United States:

(b) Licenses shall contain such terms and conditions as the Federal agency determines are appropriate for the protection of the interests of the Federal Government and the public and are not in conflict with law or this part. The following terms and conditions apply to any license:

(2) Any patent license may grant the licensee the right of enforcement of the licensed patent without joining the Federal agency as a party as determined appropriate in the public interest.

37 C.F.R. § 404.5(b)(2).

Plaintiffs cite to various portions of the License 28 Agreements to demonstrate the rights transferred to the Commission are "substantial rights" to the Patented Varieties.[5] But none of these rights include the "right of enforcement" or the "right of assignment," two determinative rights defining "substantial rights" under present case law:[6]

· The Commission has an "exclusive license" to "make, use, offer for sale, propagate, maintain, sell and otherwise exploit" the patented varieties. (EL § 2.1)

· The Commission has the exclusive right to sublicense the patented varieties. (EL § 2.2)

· The exclusive license has no expiration date. (EL § 7.1)

---

**5.** Plaintiffs cite *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed.Cir.2000), which states "the proper focus is on the 'substance of what was granted.'" *Id.* at 1250. In *Speedplay*, the licensor retained the right to bring infringement actions. Specifically, if the licensee did not halt an infringement on the patent, it had the right to bring an infringement action. This right was found "illusory" by the court because the licensee could grant a royalty-free sublicense to an alleged infringer under the license agreement, thereby making the licensor's right to sue nugatory. Here, the USDA does not have such an "illusory" right.

**6.** "EL" refers to the exclusive licenses for the Patented Varieties, attached as Exhibits 1–3 to the Commission's Motion to Dismiss. "DGL" refers to the Domestic Grower License Agreements for the Patented Varieties, attached as Exhibits 1–3 to Plaintiffs' Opposition.

· The Commission is entitled to "use all commercially reasonable efforts to protect USDA's property rights in the Licensed Variety" and the USDA is required to confer with and reach mutual agreement with the Commission regarding infringement of the patents. (EL § 8.1)[7]

Under the sublicense agreements, Plaintiffs cite the following:[8]

· right to terminate the sub-license. (DGL § 8.2)

· Right to force grower to destroy all wood of the Patented Variety. (DGL § 8.4)

Plaintiffs cite *Dow Chemical Co. v. Exxon Corp.,* 139 F.3d 1470 (Fed.Cir.1998). But the *Dow Chemical* court, in affirming the district court's decision that joinder of the patent owner was not required, noted first that the patent owner was a wholly-owned subsidiary of the licensee defendant, and was thus not required because its interests were adequately protected, and second, because the licensee had been granted the right to sue for infringement and defend the patent owner in litigation:

> [J]oinder was not required because, "as a practical matter, Exxon [Corp.] has both the duty and the capability of protecting ECPI's interests." [citation] Although ECPI remains the owner of the '783 patent, it has granted certain significant rights in the patent to Exxon Chemical Company ("ECC"), an unincorporated division of Exxon Corp. These rights include the right to sue for infringement of the patent, the right to defend ECPI in litigation concerning the patent, and the right to sublicense the patent without notifying ECPI.

*Id.* at 1479 (citation omitted). The facts differ here.

Plaintiffs also cite Eastern District of Pennsylvania, *Pennsalt Chemicals Corp. v. Dravo Corp.,* 240 F.Supp. 837 (E.D.Pa. 1965). The Court held in a declaratory suit seeking to invalidate a patent, that the patent owner was not an indispensable party even though the licensee did not have specific right to sue infringers. The court permitted the suit to proceed against a licensee who had no enforcement rights.[9] The Court noted that intervention was an option if further protection was sought by the patent owner. Despite this holding, the overall weight of the cases heavily favors evaluating license agreements on whether substantial rights are granted to the licensee. Here, the USDA did not provide the Commission, as the licensee, with the right of enforcement, nor the right of assignment, "substantial rights" in licensing the Patented Varieties.

Plaintiffs argue that Defendant overlooks case law where courts have applied a different standard in determining necessary and indispensable defendants in actions for declaratory judgment seeking invalidity. They argue that courts have allowed declaratory judgment actions for invalidity to proceed against exclusive licensees without joining the patent owner. Plaintiffs cite *A.L. Smith Iron Co. v. Dickson,* 141 F.2d 3, 6–7 (2d Cir.1944) and *Capri Jewelry Inc. v. Hattie Carnegie Jewelry Enterprises, Ltd.,* 539 F.2d 846, 847 (2d Cir.1976) (Friendly, J.).

*Capri Jewelry,* however, is not applicable, as it was a case of shared counsel, and the facts here are not similar. Counsel in

---

7. Plaintiffs' also cite sections: EL § 1.1; EL § 1.2; EL § 1.3; EL § 2.2.

8. Plaintiffs also cite sections DGL § 5.1 and DGL § 8.4.

9. "The fact that the agreement does not specifically authorize defendant to sue alleged infringers does not preclude a finding that defendant is the substantial owner of the patent for purposes of this declaratory judgment action." *Id.* at 839.

*Capri Jewelry* represented both the patent owner and the licensee and a 19(b) dismissal was reversed because the patent owner's interest was determined to be adequately protected. "Counsel representing [the licensee], Hattie Carnegie in this suit are *acting both for it [licensee] and for [the patent owner,] James* in the infringement suit [brought against another jewelry distributor]." *Id.* at 853 (emphasis added); *see also Parkson Corp. v. Andritz Sprout–Bauer, Inc.,* 866 F.Supp. 773, 775 (S.D.N.Y.1994) (highlighting *shared counsel* as critical fact in *Capri Jewelry* ). The United States is not represented by the Commission's counsel.

*A.L. Smith Iron Co. v. Dickson,* 141 F.2d 3, 6–7 (2d Cir.1944) ("Dickson"), Plaintiffs' second cite, a Second Circuit decision, does not comport with the more general and recent case law in this area. *Dickson* first noted the patent owner has an interest in deciding the forum and was a factor to be weighed:

> [I]ts only interest in the dismissal of the complaint is the interest of every patent owner in the choice of the forum in which, and the time at which, he will assert his rights. That too is an interest proper to be weighed against the plaintiff's interest in settling its present controversy with [licensee] Dickson ... Indeed, the owner may have granted a number of licenses, and it would be exceedingly oppressive to subject him to the will of all his licensees.

*Id.* at 6. But due to the unique facts of the case, the court held that the patent owner did not need to be joined to proceed with the case:

> The Court however, found that the patent owner had "plainly" used the licensee to enforce its right, and though it may not have surrendered its choice of forum, it had permitted the licensee to license, thus the court found it clearly

had dwindled its right to choose a forum.

*Id.* (emphasis added).

Case law after *Dickson,* recognizes that it is an outlier case with its unique set of facts: "Recent case law has tended to articulate the implicit denominator in the *Dickson* case. The emphasis today is upon the ability to bring suit to protect the patent against infringement; and, as a manifestation of that power, to be free to select the forum in which the question of infringement should be tried. Instead of predicating the right to sue upon the semantic categorization of litigants as 'licensees' or 'assignees,' the more recent cases have tended to place reliance upon the right to bring suit in affirmance of the patent. Then, assuming that right exists in the licensee, the licensee may be sued to test the validity of the licensed patent without the licensor-patentees being joined as a party defendant." *Caldwell Mfg. Co. v. Unique Balance Co.,* 18 F.R.D. 258, 263–264 (S.D.N.Y.1955); *see also Alamo Refining Co. v. Shell Development Co.,* 99 F.Supp. 790, 800 (D.Del.1951); *Messerschmitt–Boelkow–Blohm v. Hughes Aircraft Co.,* 483 F.Supp. 49, 52 (S.D.N.Y. 1979); *Alamo Refining Co. v. Shell Dev. Co.,* 99 F.Supp. 790, 800 (D.Del.1951). "The rationale of the general rule is that, whether the exclusive license is considered an assignment of all the patentee's rights or not, the owner suffers no prejudice from a judgment of invalidity in his absence if by agreement he has entrusted the licensee with the right to protect his interests by suing for infringement." *Messerschmitt–Boelkow–Blohm,* 483 F.Supp. at 52. "A patent owner has a property right which ought not to be adjudicated in his absence. This is a salutary principle which the courts have long recognized." *Technical Tape Corp. v. Minnesota Min. & Mfg. Co.,* 135 F.Supp. 505, 508 (S.D.N.Y. 1955).

Because the United States, as patent owner, owns and controls enforcement of the patents and assignability rights of the patents, and insufficient enforcement rights, without consent, were transferred to the Commission, the United States is a necessary party to this action under Rule 19.

### 2. Sovereign Immunity: Joinder Not Possible.

When it has been determined that an absent party to the suit is "necessary" under Rule 19(a), the inquiry is whether that party, the United States, can be joined in the action. *Dawavendewa v. Salt River Project Agr. Imp. and Power Dist.*, 276 F.3d 1150, 1159 (9th Cir.2002) ("Having determined that the Nation is thrice over a necessary party to the instant litigation, we next consider whether it can feasibly be joined as a party.") Here, unless it is clearly shown that the United States has waived its sovereign immunity, it cannot be joined.

■■■ "Absent a waiver, sovereign immunity shields the Federal government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). "It long has been established, of course, that the United States, as sovereign, 'is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' " *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (internal quotation marks omitted, omission in

original). Absent a waiver, sovereign immunity bars any proceeding against property in which the United States has an interest. *See United States v. Alabama*, 313 U.S. 274, 282, 61 S.Ct. 1011, 85 L.Ed. 1327 (1941). If the United States is immune from suit and no waiver is available, the United States cannot be joined under Rule 19(a), and is an indispensable party under Rule 19(b). *See e.g., Dawavendewa*, 276 F.3d at 1161 (because tribe enjoys tribal sovereign immunity, it cannot be joined).

■■■ A waiver of sovereign immunity must be unequivocally expressed. *Department of Army v. Blue Fox, Inc.*, 525 U.S. 255, 256, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999). The Government's consent to be sued must be construed strictly, in favor of the sovereign. *Id.* Whether sovereign immunity has been waived depends on the language of a federal statute. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) ("The starting point in interpreting a statute is its language, for '[i]f the intent of Congress is clear, that is the end of the matter.' "); *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) ("In determining the scope of a statute, we look first to its language.") This suit is against a United States' agency, USDA. Any suit against a federal agency is a suit against the United States for the purposes of sovereign immunity. *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

■■■ A declaratory judgment seeking invalidity of a U.S.-owned patent squarely implicates sovereign immunity. Further, property owners are generally necessary parties to actions that could affect their property interests adversely.[10] The Unit-

---

**10.** *McShan v. Sherrill*, 283 F.2d 462, 463 (9th Cir.1960); *Stewart v. United States*, 242 F.2d 49, 51 (5th Cir.1957).

ed States, as owner of the Patented Varieties, is no exception. In *Tegic Communications Corp. v. Board of Regents of the University of Texas System,* 458 F.3d 1335 (Fed.Cir.2006), Eleventh Amendment immunity barred a suit against a state University. Plaintiffs sought a declaratory judgment to invalidate the University-owned patent. As a result, the patent owner, the University, was dismissed. *Id.* at 1345; *see also Xechem Intern., Inc. v. University of Tex. M.D. Anderson Cancer Center,* 382 F.3d 1324 (Fed.Cir.2004) (parties and court accepted that absent waiver or abrogation, state sovereign immunity precluded litigation against the state university in a suit seeking to correct inventorship of patents owned by the university).

Plaintiffs argue that Defendant's Eleventh Amendment state sovereignty cases are not applicable here, because they concern state immunity. However, the state immunity cases demonstrate the importance of adhering to an entity's sovereign immunity, and absent a waiver of sovereign immunity, suits to invalidate a patent, owned by a sovereign, federal or state, are barred. If there is uncertainty, case law concludes that sovereign immunity applies. If ambiguity about waiver of sovereign immunity remains, that ambiguity must be interpreted to preserve sovereign immunity of the United States. "[A] waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996).

Under the only patent-related waiver of sovereign immunity, 28 U.S.C. § 1498 per-

mits private parties to bring patent infringement suits in United States Federal Claims Court to seek money damages only. 28 U.S.C. § 1498. "In waiving its own immunity from patent infringement actions in 28 U.S.C. § 1498(a) (1994 ed. and Supp. III)," the United States did not consent to treble damages nor injunctive relief, and permitted reasonable attorney's fees in a narrow class of specified instances. *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank,* 527 U.S. 627, 648, n. 11, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999). This suit must be brought in Federal Claims Court against the United States and by its plain terms 28 U.S.C. § 1498 does not cover declaratory judgments seeking to invalidate a patent. Further, the federal statute covering declaratory relief actions, the Declaratory Judgment Act, 28 U.S.C. § 2201, standing alone, does not waive sovereign immunity. *Wyoming v. United States,* 279 F.3d 1214, 1225 (10th Cir.2002) (the declaratory judgment statute, 28 U.S.C. § 2201, itself does not confer jurisdiction on a federal court where none otherwise exists). "It is well settled, however, that said Act [Declaratory Act] does not of itself create jurisdiction; it merely adds an additional remedy where the district court already has jurisdiction to entertain the suit." *Wells v. United States,* 280 F.2d 275, 277 (9th Cir. 1960).

There are limited waivers of sovereign immunity enacted by Congress for suits involving property interests of the United States, but such statutes do not address a waiver for patent-property interests of the U.S.[11] Generally property owners are necessary parties to actions that could ad-

---

11. For example, actions brought under the Quiet Title Act, 28 U.S.C. § 2409a, waiving immunity for actions brought against the United States involving "real property" in which the United States claims an interest, and Section 2410, Title 28, waiving immunity for certain actions involving "real or personal property on which the United States has or

claims a mortgage or other lien." 28 U.S.C. § 2410. The Tucker Act, 28 U.S.C. § 1491, permits monetary suits brought against the United States based on an alleged violation of a constitutional provision, statute, or regulation, if brought in the Federal Claims Court. 28 U.S.C. § 1498(a). It authorizes suits against the United States for patent infringe-

versely affect their property interests and the United States is no exception, as a patent owner.[12] The United States cannot be joined absent a clear waiver of sovereign immunity. Plaintiffs have not shown such a waiver exists. The United States cannot be joined.

Plaintiffs argue § 702 of the Administrative Procedure Act ("APA"), Title 5 United States Code, eliminates in almost every circumstance, the defense of sovereign immunity to actions seeking non-monetary relief against unlawful action by government agencies and officials. Section 702 of the APA states:

> A person *suffering legal wrong because of agency action,* or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action is a court of the United States *seeking relief other than money damages* and stating a claim that an agency or an officer or employee *thereof acted or failed to act in an official capacity or under color of legal authority* shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.

5 U.S.C. § 702 (emphasis added).

The one limitation to this waiver of sovereign immunity for *non-monetary actions* against the United States is if "any other statute that grants consent to suit expressly or *impliedly* forbids the relief which is sought." 5 U.S.C. § 702(2) (emphasis added). Defendant refers to the text of § 702 to argue that it forecloses Plaintiffs' argument concerning the APA as a waiver of sovereign immunity because Plaintiffs are not seeking a review of agency "action" or "inaction," as the suit is brought against the Commission only, the state agency and seeks, based on the actions of the Commission, a declaration of invalidity of the U.S.-owned patents.

In addition, Defendant for the first time in its Reply, discusses the split in the Ninth Circuit on whether final agency action is required to seek review under § 702 of the APA. Plaintiffs were not afforded an opportunity to respond. However, in the later case, *Gallo Cattle Co. v. U.S. Dept. of Agriculture,* 159 F.3d 1194 (9th Cir.1998), the Court held that review of agency action under the APA, only is available if it constitutes "final agency action" for which there is no other adequate remedy in a court or agency action that is made reviewable by statute. 5 U.S.C. § 704. However, in an earlier Ninth Circuit Court decision, *The Presbyterian Church (U.S.A.) v. U.S.,* 870 F.2d 518 (9th Cir. 1989), which involved an injunctive suit brought against the Immigration and Naturalization Service ("INS"), for violation of First and Fourteenth Amendment rights, the court did not limit § 702's sovereign immunity waiver to "agency action" as is technically defined in § 551(13) of the APA: " 'agency action' includes the whole or a part of an agency *rule, order, license, sanction, relief,* or the equivalent or denial

---

ment by the Untied States, but limits the patent owner's recovery to monetary damages in the Federal Claims Court. 35 U.S.C. § 282 provides affirmative defenses that can be asserted by the federal government in suits brought under 28 U.S.C. § 1498.

**12.** *See McShan v. Sherrill,* 283 F.2d 462, 463 (9th Cir.1960) (Any order that would affect title to property requires all parties interested in the title and that will be directly affected by the judgment, be before the court); *Stewart v. United States,* 242 F.2d 49, 51 (5th Cir.1957).

thereof, *or failure to act.*" 5 U.S.C. § 551(13).

Nothing in the language of the amendment suggests that the waiver of sovereign immunity is limited to claims challenging conduct falling in the narrow definition of "agency action" ... Moreover, nothing in the legislative history of the 1978 amendment of § 702 suggests that Congress intended to limit the waiver of sovereign immunity to the specific forms of "agency action" enumerated in § 551(13). On the contrary, Congress stated that "the time [has] now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity." H.Rep. No. 1656, 94th Cong., 2d Sess. 9, reprinted in 1976 U.S.Code Cong. & Admin.News 6121, 6129 (emphasis supplied). Congress singled out types of government conduct similar to the alleged INS conduct in this case-"tax investigations" and "control of subversive activities"-as appropriate for judicial review under the amended version of § 702.... This waiver was clearly intended to cover the full spectrum of agency conduct, regardless of whether it fell within the technical definition of "agency action" contained in § 551(13).

870 F.2d at 525. A later Ninth Circuit decision, *Gros Ventre Tribe v. United States,* 469 F.3d 801, 808–809 (9th Cir. 2006) recognized the split, but provided no further guidance. "The parties go to great pains to argue the issue whether the APA's waiver of sovereign immunity under 5 U.S.C. § 702 for non-monetary actions against the government is conditioned upon the parties challenging a 'final agency action' as set forth in 5 U.S.C. § 704. We now recognize that there is a conflict in our caselaw regarding this issue; however, we need not resolve it as we affirm the district court on its alternative." *Id.* at 808. While the *Gros Ventre Tribe* court

did not provide any further guidance, it discussed the issue of § 702's waiver of sovereign immunity, at length:

Under *The Presbyterian Church,* § 702's waiver is not conditioned on the APA's "agency action" requirement. Therefore, it follows that § 702's waiver cannot then be conditioned on the APA's "final agency action" requirement. *See Reno v. Am–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 510 n. 4, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (Souter, J., dissenting) ("[The waiver of sovereign immunity found in 5 U.S.C. § 702] is not restricted by the requirement of final agency action that applies to suits under the [APA]." (citing *The Presbyterian Church,* 870 F.2d at 523–26)). But that is directly contrary to the holding in *Gallo Cattle* where we stated that "the APA's waiver of sovereign immunity contains several limitations," including § 704's final agency action requirement ... Nevertheless, we need not make a sua sponte en banc call to resolve this conflict ...

469 F.3d at 809. Plaintiffs have cited no case where the APA § 702 was invoked as an asserted waiver of sovereign immunity for purposes of bringing a patent invalidity case against the United States. However, if Plaintiff can amend the Complaint to adequately state a § 702 APA claim against the United States, it may.

3. *United States is an Indispensable Party and the Disputed Claims Must be Dismissed.*

If a necessary party cannot be joined, a court must consider whether the party is indispensable. *See* Fed.R.Civ.P. 19(b). "A party is indispensable if in 'equity and good conscience,' the court should not allow the action to proceed in its absence." *Dawavendewa v. Salt River Project Agr. Imp. and Power Dist.,* 276 F.3d 1150, 1161 (9th Cir.2002), *quoting* Fed.R.Civ.P. 19(b).

██ Rule 19(b) sets out four factors to determine whether a case must be dismissed. However, where the absent party cannot be joined in light of sovereign immunity, "there may be very little need for balancing . . . because immunity itself may be viewed as the compelling factor." *Kescoli v. Babbitt,* 101 F.3d 1304, 1311 (9th Cir.1996).[13]

The four factors are:

(1) prejudice to any party or to the absent party;

(2) whether relief can be shaped to lessen prejudice;

(3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and

(4) whether there exists an alternative forum.

*Id.* at 1310–11.

██ The first factor weighs in favor of dismissal. "The first factor directs the court to consider, in determining whether the action may proceed, the prejudice to absent entities and present parties in the event judgment is rendered without joinder." *Republic of Philippines,* 128 S.Ct. at 2182. Plaintiffs seek to invalidate and declare unenforceable patents owned by the United States. The validity of the USDA's patent has been challenged. If invalidated, the USDA's assets, the Patents, would be destroyed, Patented Varieties would be freely marketed, and the USDA would lose royalties. The patents would be declared invalid under claims one through three of the Complaint and unenforceable under claim four for inequitable conduct and claim six for patent misuse.

Plaintiffs, however, argue that the Commission can and will adequately protect the USDA's interest in preserving the validity of the patents-in-suit. The Commission conceived of the patenting programs that resulted in the Patented Varieties and lobbied for its acceptance by the USDA. There is a Memorandum of Understanding between the Commission and the USDA that recognizes that their interests in the patenting program are aligned. The Commission has aggressively enforced and litigated the patents-in-suit in the past. If its interests are prejudiced, Plaintiffs argue the United States could intervene.

Plaintiffs cite *Dainippon Screen Mfg. Co., Ltd. v. CFMT,* 142 F.3d 1266 (Fed.Cir. 1998), to support their argument that in an action challenging the validity of a patent, the action can proceed without the patent owner. Here, however, unlike in *Dainippon,* there is no unity of ownership or interest between the patent owner and licensee. The facts of *Dainippon* are instructive. The patent owner in the suit was not an indispensable party because the suit was brought by a competitor against the parent company, who held an exclusive license from its wholly-owned subsidiary. *Dainippon* found no indispensability in part because the patent holder was the parent company's holding company for patents and held an identity of interest and ownership with the subsidiary. *Id.* at 1273. As to the first 19(b) factor, there was an adequacy of protection of the subsidiary's interests, the patent owner, by the parent company, the licensee. Further, the patent owner could intervene at any time. *Id.* at 1272.

---

**13.** In regard to challenges to real property interests, i.e., interests in federal land, implicating sovereign immunity, the Supreme Court and Appeals Courts have consistently held that the United States is an indispensable party. *See e.g. United States v. Alabama,* 313 U.S. 274, 282–83, 61 S.Ct. 1011, 85 L.Ed. 1327 (1941) (invalidating tax sale of federal land. "A proceeding against property in which the United States has an interest in a suit against the United States."); *Stewart v. U.S.,* 242 F.2d 49, 51 (1957) (affirming dismissal of quiet title action against United States); *Lambert v. R.F.C.,* 71 F.Supp. 509, 513 (E.D.N.Y.1947) (dismissing suit to cancel lease and force sale of government land).

The second factor, whether prejudice can be lessened by shaping the relief provided, also weighs in favor of dismissal. No declaratory, injunctive or compensatory relief would be granted under the Complaint if the patent's validity were not challenged. "Any measures to lessen these prejudices would necessarily dilute the efficacy of the judgment sought." *Messer-schmitt–Boelkow–Blohm GmbH v. Hughes Aircraft*, 483 F.Supp. 49, 53 (S.D.N.Y. 1979). Although the Complaint is brought against the Commission alone, granting declaratory relief requires finding that the Commission had no authority to enforce an invalid patent, that the patent is invalid and unenforceable, a patent which is owned by the USDA, a branch of the United States. Here, any judgment cannot be tailored to eliminate the prejudice to the United States. A finding for Plaintiffs would declare invalid patents owned by the United States, abrogating the United States' interest in the patents, not only depriving the United States of royalties under the patents, but ending the United States' ability to license the patents. In a Western District of Pennsylvania case, *Suprex Corp. v. Lee Scientific, Inc.*, 660 F.Supp. 89 (W.D.Pa.1987), the court addressed similar facts relating to a university, stated:

> Because the university [patent owner] is a necessary party, we must consider whether the action can proceed in its absence. First, a judgment of patent invalidity in the university's absence would be prejudicial. Such a judgment would devalue the university's asset, reduce royalties now accruing and severely restrict or even destroy the university's ability to develop and market the chromatography technology. Second, the prejudice to the absent patent owner cannot be lessened through the "shaping of relief" because no declaratory, injunctive or compensatory relief would be granted under the existing complaint if the patent's validity were not questioned … such relief requires a finding that Lee Scientific has no authority to enforce an invalid patent owned by the university.

*Id.* at 93.

The third factor, adequacy of remedy, also favors dismissal. " '[A]dequcy' refers not to satisfaction of [Plaintiffs'] claims, but to the 'public stake in settling disputes by wholes, whenever possible.' " *Republic of Philippines*, 128 S.Ct. at 2183, *citing Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). As in *Republic of Philippines*, "[g]oing forward with the action in the absence of" the United States, "would not further this public interest because they could not be bound by a judgment to which they were not parties." *Id.* The Court held the University had not waived its Eleventh Amendment immunity.

The fourth factor is whether there is an available alternative forum. First is the Court of Federal Claims, expressly authorized by statute. Plaintiffs have an opportunity to raise the defense of patent invalidity and unenforceability in an action brought against them for patent infringement brought by the United States or the Commission. *See* 35 U.S.C. § 282.[14]

---

14. The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded:

(1) Noninfringement, absence of liability for infringement or unenforceability,

(2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability.

(3) Invalidity of the patent or any claim in suit for failure to comply with any requirement of sections 112 or 251 of this title,

However, to require Plaintiffs to violate the license and wait to see whether the patent owner sues for infringement creates an unfavorable situation as damages could be exacerbated. Where "no alternative forum exists, the district court should be 'extra cautious' before dismissing an action." *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir.1996). But just as the courts have held in actions involving tribal immunity and state immunity, sovereign immunity of the Untied States can justify dismissal for inability to join an indispensable party, despite the fact that no alternative forum is available. "If the necessary party is immune from suit, there may be very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor." *Id.* at 1311 (internal citations and quotations omitted). The latest Supreme Court case, *Republic of Philippines v. Pimentel*, —— U.S. ——, 128 S.Ct. 2180, 171 L.Ed.2d 131 (2008), to address Rule 19, held as to immunity barring an action from proceeding without the sovereign party:

> The analysis of the joinder issue in those cases was somewhat perfunctory, but the holdings were clear: A case may not proceed when a required-entity sovereign is not amenable to suit. These cases instruct us that where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign.

128 S.Ct. at 2190–91. In this context, dismissal is appropriate even if Plaintiffs have no alternative forum for their claim. *See Dawavendewa*, 276 F.3d at 1162.

Because the proceedings in this case threaten both the property and sovereign immunity of the United States, the United States' failure to waive its immunity from suit strongly supports dismissing this litigation in its absence.

Defendant also seeks to dismiss claims four and six, for inequitable conduct and patent misuse on the same grounds that the United States is a necessary and indispensable party. Plaintiffs' fourth claim alleges inequitable conduct against Defendant Commission. In the fourth claim for inequitable conduct, Plaintiffs allege actions by the USDA and Mr. Ramming, and actions of the patent prosecuting attorneys ("Margaret A. Conner, John D. Fado, and/or Lesley Shaw, who prosecuted the application Sweet Scarlet variety") amount to inequitable conduct. (Doc. 1, Complaint ¶¶ 90, 91). The United States was not a named Defendant in this claim, although its rights will clearly be implicated if there is a finding in Plaintiffs' favor. Claim six is a patent misuse claim, seeking a judgment that the patents are unenforceable. Again, the United States is not a named party, although this claim, if decided for Plaintiffs, will adversely effect the rights of the United States. Because Plaintiffs are seeking a judgment that the '284, '891 and '229 patents are unenforceable for misuse, the United States is a necessary party and indispensable party under Rule 19 to this claim. (Complaint, ¶ 109).

Defendant's motion to dismiss pursuant to Rule 19(b) is GRANTED WITHOUT LEAVE TO AMEND, except if Plaintiffs amend to name the united States and consent to transfer of the case to the Federal Court of Claims.

## B. *INEQUITABLE CONDUCT.*

Defendant seeks, separately from its Rule 19 motion, to dismiss Plaintiffs' fourth claim for inequitable conduct on other grounds. Defendant's motion to dismiss on Rule 19 grounds has been granted

---

(4) Any other fact or act made a defense by this title.

35 U.S.C. § 282.

with conditional leave to amend. The other grounds on which Defendant argues for dismissal of the fourth claim are briefly addressed here. Defendant moves to dismiss Plaintiffs' fourth claim for inequitable conduct, which seeks a judgment that the '891 Patent for Sweet Scarlet is unenforceable. Defendant argues that Plaintiffs fail to allege an intent by USDA, and by Dr. Ramming, to deceive the PTO. Defendant also claims that Plaintiffs fail to allege their claim with the specificity required under Rule 9(b). Plaintiffs rejoin that although the Complaint does not allege the specific words "fraudulent intent," all the allegations pled by Plaintiffs regarding inequitable conduct are more than sufficient to state such a claim and comply with Rule 9(b).

 A claim for inequitable conduct requires proof that Defendant, one, affirmatively failed to disclose material information, or submitted false material information, and two, did so with an intent to deceive. "To be guilty of inequitable conduct, one must have intended to act inequitably." *FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed.Cir.1987). "Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence." *Life Technologies, Inc. v. Clontech Laboratories*, 224 F.3d 1320, 1324 (Fed.Cir.2000). Inequitable conduct must be pled with particularity. *See Central Admixture Pharmacy Servs., v. Advanced Cardiac Solutions*, 482 F.3d 1347, 1356 (Fed.Cir.2007) (inequitable conduct must be pled with particularity). "Inequitable conduct encompasses deception, fraud, or failure to disclose material information." *Chiron Corp. v. Abbott Laboratories*, 156 F.R.D. 219 (N.D.Cal.1994); *Multimedia Patent Trust v. Microsoft Corp.*, 525 F.Supp.2d 1200 (S.D.Cal.2007). (Inequitable conduct is a breach of the patentee's duties to the PTO of candor, good faith, and honesty, may be stricken pursuant to Rule 12(f) for failure to plead with particularity).

The Ninth Circuit has described the requirements of sufficiently pleading the facts to meet the requirements of Rule 9(b):

> We have held that Rule 9(b) "requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Bosse v. Crowell Collier & Macmillan*, 565 F.2d 602, 611 (9th Cir.1977); *see also Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th Cir. 1973).
>
> We have interpreted Rule 9(b) to mean that the pleader must state the *time, place, and specific content of the false representations* as well as the *identities of the parties* to the misrepresentation.

*Schreiber Distributing Co. v. Serv–Well Furniture*, 806 F.2d 1393, 1400–01 (9th Cir.1986) (RICO suit) (emphasis added).

 Plaintiffs in their Complaint allege that the '891 patent for Sweet Scarlet is unenforceable because of the inequitable conduct by the USDA and Dr. Ramming, co-inventor of Sweet Scarlet, who "knew of prior possession and reproduction under the Commission's 'amnesty program' and the group of individuals who "prosecuted the application on the Sweet Scarlet Variety before the USPTO, [who] knew of the prior possession and reproduction of the Sweet Scarlet variety by growers who admitted to such possession and reproduction under the Commission's 'amnesty program.'" (Doc. 1, Complaint, ¶ 90, IV. Claim, Inequitable Conduct). Plaintiffs allege in their Complaint, that prior to the issuance of the '891 patent, neither the USDA, nor Dr. Ramming, nor Ms. Conner, Mr. Fado and/or Mr. Shaw notified the USPTO of the prior possession and reproduction by the growers and this breached the duty of candor owed to the USPTO.

The "breach of the duty of candor constitutes inequitable conduct." (*Id.* at ¶¶ 91–92).

Plaintiffs state:

Specifically, approximately nine growers received Sweet Scarlet from Dr. Ramming for trials in 1999 and 2000. At least three of these growers sold fruit produced into commercial markets before 2002. Additionally, at least 17 other growers, who were not part of trials, received and reproduced the Sweet Scarlet variety. On information and belief, these reproductions took place prior to 2002. Neither the USDA nor Dr. Ramming oversaw or controlled the reproductions created by these 17 growers.

(Doc. 1, Complaint, ¶¶ 54–55). The totality of these assertions provide sufficient specificity for Plaintiffs have sufficiently pled a claim for inequitable conduct. This Rule 9(b) motion to dismiss is DENIED.

## C. *ANTI–TRUST*

Defendant moves to dismiss Plaintiffs' fifth claim for antitrust violations, specifically, Plaintiffs' claim under Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendant argues that Plaintiffs' anti-trust claim fails on three bases: (1) Plaintiffs have failed to allege a *cognizable relevant market* that the Commission could have monopolized; (2) Plaintiffs have failed to allege that the *Commission even participates in the alleged market* for the Patented Varieties; (3) and last, Defendant argues that Plaintiffs are *indirect purchasers and therefore lack standing* to seek damages under the anti-trust laws. Plaintiffs rejoin that they have identified a relevant market, "the worldwide market," for table grapes of these varieties; they have also alleged active participation by the Commission in the worldwide market; and they have standing to seek damages.

"Fraud in the procurement of intellectual property rights can, upon a proper showing, give rise to antitrust liability." 4 J. von Kalinowski, Antitrust Laws and Trade Regulation § 73.03 (2007). The seminal Supreme Court case on this claim is *Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). *Walker* established that a claim for "the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present." *Id.* at 174, 86 S.Ct. 347. Antitrust liability may arise when a patent has been procured by knowing and willful fraud and the patentee gaining market power in the relevant market through the use of its fraudulently obtained patent to restrain competition. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1367 (Fed.Cir.1998).

Section 2 of the Sherman Act provides:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony ..."

15 U.S.C. § 2.

In a Walker Process fraud, the antitrust claimant must show:

(1) that the asserted patent was obtained by knowingly and willfully misrepresenting the facts to the PTO;

(2) that the party enforcing the patent was aware of the fraud when bringing suit;

(3) independent and clear evidence of deceptive intent;

(4) a clear showing of reliance, *i.e.*, that the patent would not have issued but

for the misrepresentation or omission; and

(5) the necessary additional elements of an underlying violation of the anti-trust laws.

*In re Netflix Antitrust Litigation,* 506 F.Supp.2d 308, 314 (N.D.Cal.2007), *citing Nobelpharma AB, Nobelpharma v. Implant Innovations, Inc.,* 141 F.3d 1059, 1068–71 (Fed.Cir.1998).[15]

██ Plaintiffs' § 2 claim rests on allegations that Defendant illegally monopolized interstate and foreign commerce in bad faith by enforcing alleged patent rights, as the exclusive licensee of the patents and collecting royalty fees on the Patented Varieties under its "amnesty" program, prior to issuance of a valid U.S. patent. It then enforced patent rights and collected royalties on the Sweet Scarlet variety knowing that the patent could not be enforced due to prior public use.

In *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the Court clarified that "knowing and willful" fraud must be shown, and is a predicate to a potential antitrust violation. "Fraud in the procurement of a patent requires proof of the elements of common law fraud: (1) that a false representation of a material fact was made, (2) with the intent to deceive, (3) which induced the deceived party to act in justifiable reliance on the misrepresentation, and (4) which caused injury that would not otherwise have occurred." *C.R. Bard, Inc. v. M3 Systems, Inc.,* 157 F.3d 1340, 1364 (Fed.Cir.1998). "To establish fraud for purposes of antitrust violation, the defendant 'must make a greater

showing of scienter and materiality' than when seeking unenforceability based on conduct before the Patent Office." *Id. (Bard).*

### 1. Indirect Purchasers.

Defendant argues that Plaintiffs cannot sue for anti-trust damages as indirect purchasers under the *Illinois Brick* doctrine, which denies standing to indirect purchasers affected by allegedly anti-competitive activity—that is, plaintiffs purchasing products indirectly or through intermediaries. *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Defendant contends that Plaintiffs cannot seek damages by claiming that the prices of the grape vines they bought from the nurseries were inflated because of the royalties the Commission impermissibly charged the nurseries.

Defendant cites a Fourth Circuit case decision in *Kloth v. Microsoft Corp.,* 444 F.3d 312 (4th Cir.2006). In *Kloth,* the Court dismissed a monopolization claim against manufacturers brought by purchasers of computers with pre-installed software. The purchasers bought the computers from and paid intermediaries and retailers, not the manufacturer. The Court held that Plaintiffs who purchased Microsoft licenses from intermediaries and retailers when they purchased their pre-installed software computers fit the *Illinois Brick* paradigm. They were indirect purchasers prohibited from asserting a claim against the manufacturer. *Id.* at 323.

---

**15.** The law of the circuit in which the district court sits governs the antitrust law issues. "[W]hether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law." *Nobelpharma,* 141 F.3d at 1068. "When ...

the courts consider a patentee's behavior under Federal Circuit law and determine that it involved either an inappropriate attempt to procure a patent or an inappropriate attempt to enforce a patent, the remainder of the antitrust inquiry must proceed under the law of the regional circuit."

Plaintiff's antitrust claim is not however-er solely premised on inflated prices by indirect purchasers. Rather, Plaintiffs' antitrust claim is more broadly based on the enforcement of a patent, knowingly procured through fraud, by an exclusive licensee. Plaintiffs allege that the Commission's threat of enforcement and enforcement of a fraudulently obtained patent caused Plaintiffs to obtain a license it would not have otherwise been required to obtain. Under that license, Plaintiffs must comply with a number of anticompetitive clauses. (Doc. 24, Opposition, p. 23:22–24–24:1–4). Plaintiffs state that "[b]ecause [it's] antitrust claim is not based on an inflated price paid by an indirect purchaser, *Illinois Brick* is wholly inapplicable." (*Id.* at p. 24:10–12).

In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the Supreme Court held that "the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act ..." *Id.* at 174, 86 S.Ct. 347. As the Supreme Court explained, obtaining a patent "by knowing and willfully misrepresenting facts to the Patent Office ... would be sufficient to strip [the patentee] of its exemption from the antitrust laws." *Id.* at 177, 86 S.Ct. 347. "This conclusion applies with equal force to an assignee who maintains and enforces the patent with knowledge of the patent's infirmity." *Id.* at 177 n. 5, 86 S.Ct. 347.

Defendant also argues that Plaintiffs have not alleged that they have suffered compensable damages from having been unable to propagate their own vines or distribute vines to other distributors. However, Plaintiffs' Complaint makes a general allegation in paragraph 101 of their anti-trust claim that "[t]he existence and misuse of the patents on the Patented Varieties has deprived Plaintiffs of reve-nues and profits that it would have otherwise enjoyed *absent the Commission's* anticompetitive activities and patent misuse." (Complaint, ¶ 101). Although Plaintiffs do not specify what is the basis for such lost revenues and profits, they are alleging a basic *Walker Process* claim, but must add these necessary facts.

### 2. *Active Participation.*

Defendant also contends that the Commission does not participate in the market, because the Commission's only involvement is the hand-selecting three nurseries to exclusively sell all new patented table grape varieties. Plaintiffs do not allege that the Commission itself sells the Patented Varieties, rather the three nurseries are marketers and their firms are not named parties in this litigation.

Plaintiffs claim the Commission has been an active participant with direct and significant anti-competitive activities in the relevant market, sufficient to uphold an antitrust claim for:

(1) the Commission was the party that collected on-going royalties for each sale of the Patented Varieties;

(2) the Commission threatened enforcement of the patents for the Patented Varieties;

(3) the Commission threatened and sought removal of plant material for the Patented Varieties from growers' land, including growers who have licensed the Patented Varieties;

(4) the Commission required growers to pay for and obtain new licenses in order to expand existing crops of the Patents Varieties;

(5) the Commission granted "amnesty" to growers in exchange for royalty fees for the Patented Varieties under the threat of enforcement of fraudulently procured patent(s); and

(6) the Commission granted licenses to a limited number of nurseries to distribute the plant material for the Patented Varieties to the exclusion of other nurseries and on terms dictated by the Commission.

(Doc. 24, Opposition, p. 23).

■ "The gravamen of a section 2 claim is the deliberate use of market power by a competitor to control price or exclude competition." *Mercy–Peninsula Ambulance, Inc. v. County of San Mateo*, 791 F.2d 755, 758 (9th Cir.1986). If the Commission does not compete in the relevant market, then it cannot be liable for monopolizing a business in which it does not compete. *Id.* at 759. In *Mercy–Peninsula*, an ambulance company sued San Mateo County for a monopolization claim, claiming the county wrongfully excluded it from a health care provision market by refusing to grant it a contract to provide such services. *Id.* In its decision, the Ninth Circuit noted that the County, during the brief period prior to the enactment of the EMS Act, which provided it state immunity under antitrust laws, the County was not a competitor in the health care provision market, the relevant market. *Id.* The Court provided no discussion, nor cited to relevant law on the issue. But it is clear from case law that Plaintiffs must allege that Defendant has monopoly power in the relevant market, that is, the power to control prices and exclude competition. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Here, the Commission sub-licenses the patented grape stock to the nurseries and the nurseries sell grape stock to Plaintiffs, with restrictions, imposed and monitored by the Commission, on use, re-sale ability and propagation. The Commission sets the prices. It is the primary party enforcing the licenses. The nurseries do not have the power to lessen or destroy competition, they only sell the Patented Varieties based on the restrictions placed by

the Commission and the USDA. The Commission remains the primary actor dictating terms of marketing and use for the varieties in-suit.

3. *Relevant Market.*

Monopoly power is defined as "'the power to control prices or exclude competition.' The existence of such power ordinarily may be inferred from the predominant share of the market." *Id.* at 571, 86 S.Ct. 1698. To determine if a monopoly exists, it is first necessary to determine the market, both in terms of geography and product, that is being monopolized, that is the "relevant market." *Thurman Industries, Inc. v. Pay 'N Pak Stores*, 875 F.2d 1369, 1373 (9th Cir.1989). "[T]he definition of the relevant market is a factual inquiry for the jury, and the court may not weigh evidence or judge witness credibility." *Rebel Oil*, 51 F.3d at 1435. "A submarket exists if it is sufficiently insulated from the larger market so that supply and demand are inelastic with the larger market." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir.1991).

Defendant cites *Tanaka v. University of Southern California*, 252 F.3d 1059 (9th Cir.2001) and *Apani Southwest, Inc. v. Coca–Cola Enterprises, Inc.*, 300 F.3d 620 (5th Cir.2002). In *Tanaka*, a college soccer player seeking to play for a college program in Los Angeles made a conclusory allegation that the "UCLA women's soccer program" constituted its own relevant product market. *Tanaka*, 252 F.3d at 1063. The court rejected such a limited definition of the relevant market and held that women's college soccer programs "compete in the recruiting of student-athletes and, hence, are interchangeable with each other for antitrust purposes." *Id.* at 1064. In *Apani*, the Court stated: "where the plaintiff fails to define its proposed relevant

market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted." *Apani*, 300 F.3d at 628. Defendant argues that just as in *Tanaka* and *Apani*, the instant Complaint should be dismissed because it fails to allege any facts even remotely suggesting that the Patented Varieties are not interchangeable with a host of other varieties.

 "The relevant market is 'the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market.' Sullivan, Antitrust 41 (1977)." *Home Placement Service, Inc. v. Providence Journal Co.*, 682 F.2d 274, 280 (1st Cir.1982). "[T]he term 'relevant market' encompasses notions of geography as well as product use, quality, and description. The geographic market extends to the 'area of effective competition' ... where buyers can turn for alternative sources of supply.' The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001), *quoting Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir.1988).

The Supreme Court in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), stated: "The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." 504 U.S. at 482, 112 S.Ct. 2072. "The purpose of market definitions is not to frustrate anti-trust plaintiffs by requiring the proof of bright lines which do not exist, but is to help identify monopoly power, that is, 'the power to control prices or exclude competition.'" *Home Placement Service, Inc. v. Providence Journal Co.*, 682 F.2d 274, 280 (1st Cir.1982), *quoting United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

Motions to dismiss are not the place to delve into a *factual inquiry* on whether, in the market, local, regional, national, or international, for table grapes, if other varieties of table grapes are effective substitutes. As the Second Circuit court case discussed, *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir.2001), "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." "To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a 'rational relation to the methodology courts prescribe to define a market for antitrust purposes— analysis of the interchangeability of use or the cross-elasticity of demand' ... and it must be 'plausible.'" *Id.* at 200 (citations omitted). The court further explained: dismissals in such cases on the pleadings typically occur in matters involving (1) a failure to attempt to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) a failure to attempt a plausible explanation as to why a market should be limited in a particular way. *Id.* (citations omitted). "[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir.2008).

*Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510

(1962) set forth the standards for defining relevant product markets and submarkets and demonstrates the fact-intensive considerations:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593–595, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

370 U.S. at 325, 82 S.Ct. 1502.

"This Court's prior cases support the proposition that in some instances one brand of a product can constitute a separate market." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Plaintiffs' Complaint alleges that the Commission conspires to "monopolize the world-wide market for the four Patented Varieties of table grapes ..." (Complaint, ¶ 102). Plaintiffs' claim the geographic market is the "world-wide market" and the relevant product market is each Patented Variety, the existence of the plant patents limits the myriad of other varieties of table grapes from being substitutes for the Patented Varieties in the world-wide market. This does not follow logically or legally without further definition and description of the table grape market, such as unique characteristics that set the three varieties apart in sub-markets.

If there are effective substitutes, they must be considered part of the relevant market. Plaintiffs do not allege in the Complaint that no other substitutes for each Patented Variety exist, but state for the first time in their opposition papers, that there are submarkets and that each Patented Variety, Sweet Scarlet, Autumn King and Scarlet Royal, are inherently unique as each grapevine and fruit must derive from the single parent plant. Although dubious, it is not impossible that each Patented Variety constitutes a relevant market. *See Walker*, 382 U.S. at 177–178, 86 S.Ct. 347 ("To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure Food Machinery's ability to lessen or destroy competition. It may be that the device-knee-action swing diffusers—used in sewage treatment systems, does not comprise a relevant market. There may be effective substitutes for the device, which do not infringe the patent. This is a matter of proof, as is the amount of damages suffered by Walker.")

■ The market must include all economic substitutes, "... it is legally permissible to premise antitrust allegations on a submarket. That is, an antitrust claim may, under certain circumstances, allege restraints of trade within or monopolization of a small part of the general market of substitutable products. In order to establish the existence of a legally cognizable submarket, the plaintiff must be able to show (but need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the general product market." *Newcal Industries, Inc.*

*v. Ikon Office Solution,* 513 F.3d 1038, 1045 (9th Cir.2008).

Because Plaintiffs allege for the first time in their Opposition to these Motions that each Patented Variety is a distinct product market within the table grape market, and do not allege that the Commission holds market power in each Patented Variety market or the scope of that market, they are GRANTED LEAVE TO AMEND to allege the relevant market.

D. *Patent Misuse.*

■ Defendant seeks, on separate grounds from its Rule 19 motion, to dismiss Plaintiffs' sixth claim for patent misuse. Defendant's motion to dismiss on Rule 19 grounds has been granted. Nonetheless, the other grounds Defendant advances for dismissal of the sixth claim are briefly addressed. "The concept of patent misuse arose to restrain practices that did not in themselves violate any law, but that drew anticompetitive strength from the patent right, and thus were deemed to be contrary to public policy. The policy purpose was to prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right." *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 705 (Fed.Cir.1992). "Patent misuse is viewed as a broader wrong than antitrust violation because of the economic power that may be derived from the patentee's right to exclude. Thus misuse may arise when the conditions of antitrust violation are not met." *C.R. Bard, Inc. v. M3 Systems, Inc.,* 157 F.3d 1340, 1372 (Fed.Cir.1998).

■ A court's inquiry into a misuse claim is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect. *Id.* Since patent misuse arises in equity, if found to be patent misuse, the patent is rendered unenforceable. And re-

mains unenforceable until the misuse ends, the patent however is not invalidated. *Id.*

■ "When a practice alleged to constitute patent misuse is neither per se patent misuse [e.g. tying arrangements or post-expiration royalties] nor specifically excluded from a misuse analysis by § 271(d) [Patent Misuse Reform Act, 35 U.S.C. § 271(d) ], a court must determine if that practice is 'reasonably within the patent grant, *i.e.,* that it relates to subject matter within the scope of the patent claims.' [citation.] If so, the practice does not have the effect of broadening the scope of the patent claims and thus cannot constitute patent misuse. [citation.] If, on the other hand, the practice has the effect of extending the patentee's statutory rights and does so with an anti-competitive effect, that practice must then be analyzed in accordance with the 'rule of reason.' [citation]. Under the rule of reason, 'the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect.'" *Virginia Panel Corp. v. MAC Panel Co.,* 133 F.3d 860, 869 (Fed.Cir.1997) (citations omitted).

Defendant claims that two of Plaintiffs' theories do not constitute patent misuse: collecting royalties before a patent issues, and imposing post-sale restrictions on propagation of new vines and distributions to third parties. Plaintiffs' third theory also fails because Plaintiffs have failed to identify a cognizable market required for this type of patent misuse claim. This last argument has already been addressed for the anti-trust claim and need not be repeated.

Plaintiffs' complaint alleges the following three theories of patent misuse:

(i) enforcing alleged patent rights and collecting royalty fees on the Patented Varieties under its "amnesty" program prior to issuance of a valid United States patent,

(ii) enforcing patent rights (including demanding the removal of Patented Varieties) and collecting royalties on the Sweet Scarlet variety while knowing that the patent on Sweet Scarlet could not be enforced due to prior public use and inequitable conduct, and

(iii) imposing on growers a Domestic Growers' License Agreement, which purport to extend the Commission's rights to Patented Varieties even after sale despite the exhaustion of those rights upon sale of the patented plant.

(Complaint, ¶ 106).

 As to the first theory, there is no viable claim for the "amnesty program" as the Commission could not have misused patents that did not exist and at most were inventions in the pre-issuance stage. License agreements entered into after a patent application has been filed but before the patent issues are not necessarily unenforceable. *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 264–65, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979). The "key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed.Cir.1998). Pre-issuance, there is no patent right to impermissibly broaden. The doctrine of patent misuse could not be brought into play in *Aronson*, which concerned a license agree-

ment entered into before issuance of the patent, but after patent application submitted. 440 U.S. at 264–65, 99 S.Ct. 1096; *see also Technology Licensing Corp. v. Gennum Corp.*, No. 01–04204, 2007 WL 1319528, at *23 (N.D.Cal. May 4, 2007) ("As to Gennum's argument that TLC's interactions with Ross Video constituted misuse of the '250 patent, it is a peculiar notion that a party could "misuse" a patent that is not in existence. While it has been called patent misuse where a patentee seeks to collect royalties after the expiration of the patent term, it appears that in such cases the patentee and licensor have typically entered into the royalty agreement at a time when the patent is in force. Again, to the extent a party demands royalties or demands that another cease using a product where no patent has yet issued, the other party is not put to the type of choice that patent misuse doctrine normally guards against. The other party is free to ignore the demands.") [16]

The motion to dismiss the pre-issuance claim of misuse is GRANTED WITHOUT LEAVE TO AMEND.

 Defendant also seeks to dismiss Plaintiffs' claim about the restrictions imposed through the License Agreements prohibiting the propagation of the grapevines or distribution of the vines to third parties (Plaintiffs' third theory—extending "the Commission's rights to Patented Varieties even after sale despite the exhaustion of those rights upon sale of the patented varieties.") (Complaint, ¶ 27). Plaintiffs appear to concede in their Opposition that they cannot assert a patent misuse claim on the basis that the Commission has allegedly attempted to extend patent rights

---

**16.** Plaintiffs cite several cases which do not support a patent misuse claim pre-issuance patent, including a Texas Court of Appeals case, *Reich v. Reed Tool Co.*, 582 S.W.2d 549 (Tex.Civ.App.1970), which is not applicable in the Ninth Circuit. And none of these cases addresses whether collecting royalties per-issuance of patent on its own constitutes a "rule of reason" patent misuse claim.

by prohibiting "growers who purchased the Patented Varieties from propagating the grapevines or distributing the vines to third parties." (*Id.*) "Second, the Commission contends that its restrictions on propagation of new vines and distribution to third parties do not constitute misuse. While this may be true, the Commissions licensing agreements do not simply limit growers from distributing new vines." (Opposition, p. 26); [17] *see Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 708 (Fed.Cir.1992) (a patent holder may lawfully restrict a licensee's right to use or sell a patented invention, so long as the restriction is "reasonably within the patent grant," but not if "the patentee has ventured beyond the patent grant and into behavior having an anticompetitive effect not justifiable under the rule of reason."); *Monsanto Co. v. McFarling,* 363 F.3d 1336, 1341 (Fed.Cir.2004) ("In the cases in which the restriction is reasonably within the patent grant, the patent misuse defense can never succeed."); *B. Braun Med. v. Abbott Labs.,* 124 F.3d 1419, 1426 (Fed.Cir.1997) ("[E]xpress conditions accompanying the ... license of a patented product are generally upheld.") Here, it is not misuse of a plant patent to prevent the plant's disclosure to prevent its reproduction.

Defendant's motion to dismiss Plaintiffs' sixth claim as to theories one and portions of three is GRANTED WITHOUT LEAVE TO AMEND.

E. *Unfair Competition.*

Defendant moves to dismiss Plaintiffs' seventh claim for unfair competition under California Business and Professional Code § 17200 and California Common Law. Defendant contends that Plaintiffs have not alleged unlawful conduct because Plaintiffs' only allegation of violation of another law is Section 2 of the Sherman Act. Absent a Section 2 violation, Defendant argues Plaintiffs fail to state a claim under the "unlawful" prong of § 17200.

The purpose of the Unfair Competition Law, Cal. Bus. & Prof.Code § 17200 et seq., "is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. [Citation.]" *Kasky v. Nike, Inc.,* 27 Cal.4th 939, 949, 119 Cal. Rptr.2d 296, 45 P.3d 243 (2002). It "defines 'unfair competition' to mean and include 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (§ 17500 et seq.) ].' (§ 17200.)." *Id.* at 949, 119 Cal.Rptr.2d 296, 45 P.3d 243. The scope of the UCL has been viewed by California Courts as "quite broad." *McKell v. Washington Mut., Inc.,* 142 Cal. App.4th 1457, 1471, 49 Cal.Rptr.3d 227 (2006). "Because the statute is framed in the disjunctive, a business practice need only meet one of the three criteria to be considered unfair competition." *Id.* Such a claim can cover anticompetitive business practices and injuries to consumers. It can encompass violations of other laws, treating them as unlawful practices, that are independently actionable under the unfair competition law, but a practice can be deemed unfair even if not specifically proscribed by some other law. *Cel–Tech Communications, Inc. v. Los Angeles,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999).

---

**17.** Plaintiffs also argue in response to Defendant's motion to dismiss its' sixth claim that the Commission restricts third party distribution that extends into foreign territories and cite *Extractol Process v. Hiram Walker & Sons,* 153 F.2d 264 (7th Cir.1946). *Extractol* is an older Seventh Circuit decision that does not address patent misuse. Neither party fully briefed this issue, which cannot be resolved as the arguments are unclear.

The seventh claim states: "The Commission has unlawfully and unfairly exploited the '284, '891 and '229 patents in a manner that violates antitrust laws and in a manner that attempts to extend these patents beyond their lawful scope. Such acts constitute unfair trade practices and unfair competition under California Business and Professions Code § 17200, *et seq.*, and under the common law of the State of California, entitling Plaintiffs to relief." (Complaint, ¶ 111).

To state an UCL claim under the "unlawful" prong, Plaintiffs are required to allege a violation of another law. "The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law, be it civil or *839 criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Saunders v. Superior Court,* 27 Cal.App.4th 832, 839, 33 Cal.Rptr.2d 438 (1994). Defendant moves to dismiss this portion of the Unfair Competition claim.

■ Plaintiffs argue that they have stated a cognizable antitrust claim for relief under *Walker Process,* including the allegation of a relevant market. Defendant contends that Plaintiffs have failed to state a claim under the "unfair" prong, because the anticompetitive acts Plaintiffs allege for an unfair practice claim are based primarily on the same conduct as their antitrust claim. Plaintiffs rejoin that their allegations of the Commission's unfair actions go beyond antitrust complaints and that California's unfair competition law is "broad" and "sweeping" and may include a vast range of unfair conduct. An unfair act under § 17200 is defined as one that "offends an established public policy or ... is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Heighley v. J.C. Penney Life Ins. Co.,* 257 F.Supp.2d 1241, 1259 (C.D.Cal.2003); *quoting Walker v. Countrywide Home Loans, Inc.,* 98 Cal.App.4th

1158, 1170, 121 Cal.Rptr.2d 79 (2002). " 'Unfair' simply means any practice whose harm to the victim outweighs its benefits." *Saunders v. Superior Court,* 27 Cal. App.4th 832, 839, 33 Cal.Rptr.2d 438 (1994).

■ Plaintiffs argue they have satisfied the "broad and sweeping" "unfair" competition claim requirement because they have alleged that the Commission has engaged in a broad range of unlawful and unfair activities, including the enforcement of a patent known to be fraudulently procured, improperly seeking to extend the scope of the patent monopoly, and collecting patent royalties from growers who paid for the research and development of the patented varieties through assessment fees.

Defendant disputes Plaintiffs' contention that they alleged the Commission was "collecting royalties from grower" who already paid assessments. Defendant asserts that the theory is not alleged in Plaintiffs' Complaint. Plaintiffs' Complaint provides adequate notice to Defendant by the allegations:

> For years, California table grape growers and shippers have funded a research program under the U.S. Department of Agriculture ("USDA") to develop new table grape varieties. Growers and shippers fund the USDA research program through the Commission by an assessment on each box of table grapes shipped in California. Prior to 2002, the USDA provided the new varieties under development to area growers for evaluation of growing potential and commercial marketability. Once new varieties appeared commercially viable, the USDA "released" the variety, and distributed plant material of the variety to area growers free-of-charge. The USDA did not charge California growers for the new varieties since California growers

and shippers already paid for a large portion of the development.

In the late 1990s, the Commission developed a scheme by which it and a few select nurseries could profit from the new varieties that the USDA distributed for free. At the urging of the Commission, the USDA agreed to begin patenting new table grape varieties. Although California shippers already funded much of the development, the USDA agreed to give the Commission an exclusive license to all new patented varieties, and to allow the Commission to charge royalties when growers wished to obtain the new varieties. The USDA also agreed to give the Commission exclusive enforcement powers over its new patent rights.

(Complaint, ¶¶ 10–11). This alleged "double payment scheme" is entirely premised on the patent laws and the monopoly effect resulting from a valid patent. This claim is entirely derivative of the patent claim, which cannot proceed in this Court.

Defendant's motion to dismiss Plaintiffs' seventh claim is DENIED.

### F. Unjust Enrichment and Constructive Trust

Defendant moves to dismiss Plaintiffs' eighth and ninth causes of action for unjust enrichment and constructive trust, respectively. These claims are dependent upon Plaintiffs' substantive claims seeking monetary relief, the antitrust claims and unfair competition claims. Defendant's motion to dismiss the eighth and ninth causes of action is based on the argument that they have proved that the substantive claims must be dismissed, therefore the unjust enrichment and constructive trust claims must also be dismissed as well. Plaintiffs' substantive claim for unfair competition has not been dismissed.

Defendant's motion to dismiss Plaintiffs' eighth and ninth causes of action is DENIED.

### G. Motion to Strike.

■ Defendant moves to strike certain portions of the Complaint. Rule 12(f) provides that "redundant, immaterial, impertinent, or scandalous matters" may be "stricken from any pleading." Fed. R.Civ.P. 12(f) (emphasis added). A motion to strike is limited to pleadings. See Sidney–Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir.1983). However, a "motion to strike" materials that are not part of the pleadings may be regarded as an "invitation" by the movant "to consider whether [proffered material] may properly be relied upon." United States v. Crisp, 190 F.R.D. 546, 551 (E.D.Cal.1999); quoting Monroe v. Board of Educ., 65 F.R.D. 641, 645 (D.Conn.1975). A motion to strike has sometimes been used to call to courts' attention questions about the admissibility of proffered material in ruling on motions. Id.

Defendant moves to strike allegations in Plaintiffs' antitrust claim regarding the Commission's "amnesty" program because Plaintiffs have not alleged they participated in the program nor that they suffered any injury in fact as a result of the amnesty program. Plaintiffs rejoin that these allegations are highly relevant to their claim and not stated simply for antitrust damages suffered by Plaintiffs. The allegations regarding the "amnesty" program are that 17 growers were in possession of Sweet Scarlet prior to February 2002 and show: (1) the Commission's knowledge that the patent on Sweet Scarlet was fraudulently procured; (2) the Commission's attempts to avoid invalidity challenges to the Sweet Scarlet Patent, knowing it was fraudulently procured; (3) the Commission's threat of enforcement and

enforcement of patents known to be fraudulently procured; and (4) the Commission's attempt to extend the scope of its patents beyond their legal bounds.

Motions to strike are however disfavored and infrequently granted. *See Pease & Curren Refining, Inc. v. Spectrolab, Inc.*, 744 F.Supp. 945, 947 (C.D.Cal. 1990), *abrogated on other grounds by Stanton Road Associates v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir.1993). Such motions should be granted only where it can be shown that none of the evidence in support of an allegation is admissible. *See id.*

Defendant's motion to strike the "amnesty program" allegations is DENIED.

Defendant also moves to strike portions of Plaintiffs' prayer for relief sections. Plaintiffs respond that striking certain prayers for relief is not the proper subject of a motion to strike and cite to a Massachusetts District Court case, *Massachusetts v. Russell Stover Candies, Inc.*, 541 F.Supp. 143, 145 (D.Ma.1982) which denied a motion to strike prayers for relief, finding it did not fall within any of the categories referred to in Rule 12(f). Rule 12(f) states "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). There does not appear to be any Ninth Circuit law addressing the striking of the prayer for relief sections. However, the prayer for relief section is not a substantive part of the pleading and is irrelevant if not supported by evidence. The relief provided for the various claims will be determined if any entitlement to remedies is proved.

Defendant's request to strike various portions of the prayer for relief sections is DENIED.

## VII. *CONCLUSION*

For all the reasons stated above:

1. Defendant's motion to dismiss Plaintiffs' declaratory relief claims pursuant to Rule 19 is GRANTED WITH LEAVE TO AMEND to transfer the case to the Federal Court of Claims;

2. Defendant's motion to dismiss Plaintiffs' inequitable conduct claim is DENIED;

3. Defendant's motion to dismiss Plaintiffs' antitrust claim is GRANTED WITH LEAVE TO AMEND;

4. Defendant's motion to dismiss all Plaintiffs' patent misuse claims is GRANTED WITHOUT LEAVE TO AMEND;

5. Defendant's motion to dismiss Plaintiffs' unfair competition claim is DENIED;

6. Defendant's motion to dismiss Plaintiffs' claims for constructive trust and disgorgement is DENIED; and

7. Defendant's motion to strike is DENIED.

IT IS SO ORDERED.